**Randall GREER, Plaintiff,**

v.

**Wayne IVEY, Town of Indialantic, James Haman and Diomedis Canela, Defendants.**

**Case No: 6:15–cv–677–Orl–41GJK**

United States District Court, M.D. Florida, Orlando Division.

Signed 03/14/2017

Benedict P. Kuehne, Law Office of Benedict P. Kuehne, PA, Miami, FL, Douglas R. Beam, Riley H. Beam, Douglas R. Beam, PA, Melbourne, FL, Marjorie Gadarian Graham, Marjorie Gadarian Graham, PA, Palm Beach Gardens, FL, for Plaintiff.

D. Andrew DeBevoise, Thomas W. Poulton, DeBevoise & Poulton, PA, Winter Park, FL, Eric J. Netcher, F. Scott Pend-

ley, Dean, Ringers, Morgan & Lawton, PA, Bruce R. Bogan, Melissa Jean Sydow, Hilyard, Bogan & Palmer, PA, Orlando, FL, Bruce W. Jolly, Purdy, Jolly, Giuffreda & Barranco, PA, Ft. Lauderdale, FL, for Defendants.

## ORDER

### CARLOS E. MENDOZA, UNITED STATES DISTRICT JUDGE

THIS CAUSE is before the Court on the Motion for Summary Judgment (Doc. 174) filed by Defendant Town of Indialantic ("the Town"). Plaintiff filed a Response (Doc. 231), to which the Town filed a Reply (Doc. 237). This cause is also before the Court on Defendant Diomedis Canela's Motion for Summary Judgment (Doc. 183), to which Plaintiff filed a Response (Doc. 233), and Defendant Canela filed a Reply (Doc. 239), as well as Defendant James Haman's Motion for Summary Judgment (Doc. 194), to which Plaintiff filed a Response (Doc. 234), and Defendant Haman filed a Reply (Doc. 241). Additionally, before the Court is Defendant Sheriff Wayne Ivey's Motion for Summary Judgment (Doc. 185). Plaintiff filed a Response (Doc. 235), and Defendant Ivey filed a Reply (Doc. 240). For the foregoing reasons the Town's Motion for Summary Judgment, Defendant Canela's Motion for Summary Judgment, Defendant Haman's Motion for Summary Judgment, and Defendant Ivey's Motion for Summary Judgment will be granted.

### I. FACTUAL BACKGROUND

Plaintiff, Randall Greer, brings this action as the personal representative of his brother, Christopher Greer,[1] (Third Amended Complaint ("TAC"), Doc. 117, at 4), who was shot and killed by Defendants Corporal James Haman and Deputy Diomedis Canela of the Brevard County Sheriff's Office on January 13, 2013. The following is a summary of the undisputed material facts regarding the shooting of Christopher. In the early afternoon on January 13, 2013, Plaintiff drove his truck to the home of his recently deceased parents to clean out the garage, as he was preparing the home so that it could be sold or rented. (Pl.'s Dep. Pt. 1, Doc. 173–13, at 33:24–34:2, 125:16–19, 38:1–25, 48:8–19, 49:5–7; Pl.'s Dep. Pt. 2, Doc. 173–14, at 201:6–7). Christopher had been living in the home, located at 700 North Shannon Avenue, Indialantic, Florida, (hereinafter, "Greer Residence") with his parents prior to their death, (Doc. 173–13 at 9:9–10), and continued to live there alone after his parents died, (see id. at 37:4–6). Later in the afternoon, Plaintiff's wife, Christine,[2] also stopped by the Greer Residence. (Id. at 52:22–53:11).

According to Plaintiff, Christopher was severely depressed. (Id. at 96:13–23). Christopher was also paranoid, had auditory hallucinations, and was a vulnerable adult who heard voices, feared for his life, and frequently believed people were breaking into his home. (Id. at 27:3–21, 60:7–61:6; Holstine Dep. Pt. 2, Doc. 173–19, at 195:8–17). The Indialantic Police Department received numerous calls to the Greer Residence, many of which were initiated by Christopher, claiming that he heard things at night near his house. (Mor-

---

1. To avoid confusion, Randall Greer will be referred to as "Plaintiff," and Christopher Greer will be referred to as "Christopher."

2. Christine indicated in her testimony that she was in the process of divorcing Plaintiff. Nev-

ertheless, Christine will be referred to as Christine Greer or Plaintiff's wife throughout this Order as they were married at all times relevant to this matter.

ris Dep., Doc. 173–22, at 73:6–22). Due to his paranoia, Christopher always carried a knife in a sheath on his belt. (Doc. 173–13 at 62:22–63;6). He also often wore a small knife around his neck. (*Id.* at 63:9–15). Additionally, Christopher was disabled from a work-related accident. (*Id.* at 24:18–23).[3]

About a month before January 13, 2013, Plaintiff visited the Indialantic Police Department and met with Police Chief Troy Morris. (Doc. 173–22 at 76:18–77:1). Morris was aware that Christopher had mental health issues. (*Id.* 98:11–21). Plaintiff spoke with Morris and another officer, Sergeant Casey, at the police department about his brother's mental health. Plaintiff informed Morris and Casey that he was concerned about the medications that Christopher was taking. (*Id.* at 81:9–11). Casey suggested that Plaintiff attempt to see Christopher's doctors in person. (*Id.* at 82:19–22). Plaintiff also inquired about having Christopher Baker Acted. (*Id.* at 82:22–25, 83:10–17). Morris explained the Baker Act and its limitations to Plaintiff. (*Id.* at 83:15–17, 83:22–84:6). More specifically, Morris told Plaintiff that "[the Indialantic Police Department] will not Baker Act your brother" and that he needed to go to the court if he wanted Christopher to be mentally evaluated. (Doc. 173–14 at 236:22–237:1; *see also* Doc. 173–22 at 83:1–9 (indicating that Casey suggested that Plaintiff could seek help in getting Christopher Baker Acted through the court system)). Morris informed Plaintiff that Christopher could not be Baker Acted by the police unless he was a threat, (Doc. 173–14 at 232:11–14), and advised Plaintiff to call the police if Christopher did any-

thing that warranted immediate attention, such as behaving violently, (Doc. 173–22 at 84:15–20).

On January 13, 2013, while Plaintiff worked on cleaning out the garage, Christopher remained inside the home, smoking cigarettes, watching TV, and making phone calls. (Doc. 173–13 at 51:21–24). Christopher was agitated because he was unable to get the pain medications he needed. (*Id.* at 51:20–21; *see also id.* 51:3–16). He had been without his pain medication for several days, and it was causing him to be distressed. (*Id.* at 51:14–16). When Plaintiff was finished cleaning for the day and as Plaintiff was getting ready to leave the house, while standing outside near the front door to the house, Plaintiff reprimanded Christopher for smoking in the house and for not helping Plaintiff clean. (*Id.* at 56:3–9, 57:9–18, 58:18–59:1). Christopher responded by stating that he was overwhelmed. (*Id.* at 57:19–58:8). Christopher grew upset and pulled a knife out of the sheath on his belt and started waving it around. (*Id.* at 59:5–9, 60:2–6; Christine Greer Dep., Doc. 173–11, at 131:25–132:7). Plaintiff warned Christopher that this behavior could cause Plaintiff to call the police and have Christopher Baker Acted (Doc. 173–13 at 59:10–17, 65:7–9), and Christopher responded "don't go there." (*Id.* at 59:18–19). He continued to wave the knife in the air while hobbling towards Plaintiff. (*Id.* at 61:15–17, 65:2–4). Plaintiff walked backwards towards the mailbox, and eventually Christopher put the knife away. (*Id.* at 65:20–22, 66:10–11, 61:20). After sheathing the knife, Christopher walked up to Christine, (*id.* at 61:20–21), and while talking to her, Plaintiff re-

---

**3.** Christopher suffered brain damage from a seizure injury, (Doc. 173–13 at 24:22–23), his left hand was almost completely useless, he had herniated disks in his back, broken bones in his feet, and he was unable to perform many of the activities of daily living because walking and moving were generally very painful and difficult for him, (*id.* at 36:1, 36:5–12).

moved the knife from Christopher's sheath and threw it in the back of his truck. (*Id.* at 61:24–62:1). Christopher responded by grabbing Christine's throat and stating "I don't need that." (*Id.* at 62:1–3). Christopher then said he was sorry, went back into the house, (*id.* at 62:4–5), and Plaintiff called 911, reporting that "my brother just pulled a knife on me and he grabbed my wife and threatened her," (*id.* at 62:6; 911 Phone Call Tr., Doc. 174–1, at 2). Plaintiff indicated that Christopher had gone inside but that he was coming back out and that he "need[ed]" an officer immediately." (Doc. 174–1 at 2).

Officer Scott Holstine from the Indialantic Police Department was dispatched to the Greer Residence in response to Plaintiff's 911 phone call, (Holstine Dep. Pt. 1, Doc. 173–18, at 46:24–47:2), and was the first to arrive on the scene, (*id.* at 53:4–6). Holstine was generally aware that Christopher suffered from physical and mental ailments. (*Id.* at 64:22–65:11). He had previously visited the Greer Residence in response to calls made to the police on a number of occasions and also knew that other law enforcement departments and officers had responded to calls at the Greer Residence. (*See id.* at 33:16–23, 65:13–66:14). Based on Holstine's prior experiences at the Greer residence, he had come to believe that that Christopher was paranoid. (*Id.* at 91:18–24; Holstine Dep. Pt. 2, Doc. 173–19, at 158:10–159:13, 195:13–17; *see also* Doc. 173–18 at 92:1–6). Additionally, Holstine was aware that Christopher was living alone at the Greer Residence on January 13, 2013. (Doc. 173–19 at 195:22–25).

Upon arriving on the scene, Holstine spoke with Plaintiff who reported that Christopher had come at him with a knife and choked his wife. (Doc. 173–18 at 54:5–7). Holstine looked at Christine's neck and verified that there were red marks consistent with being choked. (*Id.* at 54:7–10). Plaintiff further informed Holstine that Christopher was in the home and needed a medical evaluation. (Doc. 173–13 at 70:24–71:1; *see id.* 69:11–14). Specifically, he asked that Christopher be evaluated for a Baker Act. (Doc. 173–19 at 120:3–4; *see also* Doc. 173–13 at 70:19–22 (testifying that Plaintiff told Holstine that they could get Christopher Baker Acted since Christopher had shown a knife)). Holstine asked if there were any weapons in the home, and Plaintiff responded that there were knives and a disassembled cross-bow. (Doc. 173–13 at 72:13–16; Doc. 173–19 at 126:13–17).[4]

Holstine saw Christopher standing inside the front door behind a mesh screen door, approached, and asked Christopher to come out of the house, but Christopher closed the door, saying "don't even think about it." (Doc. 173–13 at 83:1–4, 84:14–20; Doc. 173–18 at 54:13–18, 63:5–14; Doc. 173–19 at 129:6–8). Thereafter, Holstine requested assistance from the Brevard County Sheriff's Office so that he could maintain a perimeter around the home. (Doc. 173–19 at 114:18–21, 124:2–5, 124:14). Holstine also requested that Plaintiff and Christine leave the scene, and they promptly complied. (Doc. 173–18 at 54:20–24; Doc. 173–19 at 218:19–20).

In response to Holstine's request for back-up, Haman arrived on the scene. (Ha-

---

4. It is disputed whether Plaintiff told Holstine that there were firearms in the house. (*Compare* Doc. 173–13 at 72:14–15, *and* 72:19–25, *with* Doc. 173–19 at 126:13–25). As the discussion below will demonstrate, this dispute does not concern a material fact. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (stating that a fact is material if it may "affect the outcome of the suit under the governing law").

man Aff., Doc. 194–1, ¶ 3). Holstine briefed him. (Doc. 173–19 at 133:8–11). According to Haman's in-car dash camera, Holstine specifically advised Haman: "It's a knife agg. assault with a knife. DV, the guy's a signal 20, history of suicide, parents died recently. He's got a lot of health issues. He ah choked his brother's wife. Choke marks on her neck." (FDLE Investigative Summary of In–Car Audio, Doc. 185–2, at 20). Haman understood that "signal 20" meant that Christopher may have a mental illness. (Haman Dep. Pt. 1, Doc. 173–15, at 41:5–8). He also under stood that "DV" meant that the reported incident involved domestic violence. (*Id.* at 41:1–4). Holstine also informed Haman that Christopher was armed with knives, a disassembled cross-bow, and potentially firearms. (Doc. 173–19 at 133:15–16).[5] Thereafter, Haman took charge of the response. (Doc. 173–15 at 128:14–18).

While Haman was en route to the Greer Residence, he had requested an officer to report to the scene with a shield. (*Id.* at 44:24–45:7). Canela reported to the Greer Residence with a ballistic shield. (Canela Dep., Doc. 173–8, at 139:17–20, 157:22–23; *see id.* at 109:1–14). When he arrived, Haman was using the public address system in Holstine's vehicle and requesting Christopher to exit the home. (*Id.* at 153:24–154:10). Christopher did not respond. (*See id.* at 154:25–155:1). Canela was not briefed on all the details of the case. (*Id.* at 158:12–15). Rather, upon his arrival Holstine asked if Canela remembered the house, (Doc. 173–19 at 138:18–20), and Canela responded that he did, (*id.* at

138:21). Shortly after Canela's arrival, Haman asked Canela to grab his shield, (Doc. 173–8 at 157:24), and Haman and Canela approached the front door of the Greer Residence, (Doc. 173–19 at 140:15–18, 140:23–24). Haman and Canela knocked on the door, asked Christopher to come out, and announced that they were with the Sheriff's Office, but Christopher did not respond. (Doc. 173–8 at 169:8–22; Doc. 173–19 at 141:1–10). The garage door was open, and Haman and Canela subsequently entered the garage, planning to try to make contact with Christopher through the interior door of the garage that led into the home. (Doc. 173–8 at 180:20–22). Canela led the way to the door, providing cover with the shield, and Haman was behind him. (*Id.* at 185:4–11). Both Officers had their guns out. (*Id.* at 185:8–9). Holstine stayed further behind Haman and Canela to provide cover. (Doc. 173–19 at 139:25–140:8). Haman and Canela made an announcement once they reached the interior door, (Doc. 173–8 at 185:13–21), and then were able to open the door without resistance, (*id.* at 187:1–188:3).

While standing at the threshold of the door and "cutting the pie"[6] to determine if there were any threats inside the home, Canela saw Christopher standing to the left of the doorway. (*Id.* at 188:4–9; Canela Dep. Pt. 2, Doc. 173–9, at 198:16–18, 201:20–25, 201:2–10). Canela observed a knife in a sheath on Christopher's side and Christopher walking towards the door. (*Id.* at 204:7–13, 204:19–21). Canela took a step back and warned Haman and Holstine that Christopher had a knife. (*Id.* at 198:20–25,

---

5. This was due to Holstine's apparent misunderstanding that Christopher possibly possessed a firearm. (*See* Doc. 173–13 at 72:14–15, 72:19–25; Doc. 173–19 at 126:13–25).

6. "Cutting the pie" is a technique where one slowly turns to survey an area and to ensure that there is a clear view and that there are no present threats or safety hazards. (Doc. 173–8 at 188:4–9).

199:11–14, 205:21–24). Thereafter, Christopher slammed the door shut. (*Id.* 206:5–207:4; Doc. 173–19 at 144:20–21).

Haman kicked the door numerous times, but the door would not open. (Doc. 194–1 ¶ 9; *see also* Doc. 173–15 at 171:18–21). As a result, Haman and Canela believed Christopher was leaning up against the door to keep it shut. (Doc. 173–15 at 172:23–173:7; Doc. 194–1 ¶ 9). However, eventually Canela realized that the opposing force had let off the door, and he announced this to Haman and Holstine. (Doc. 173–9 at 221:22–222:3; Doc. 173–19 at 148:12–13). Haman kicked the door, and this time, it flew open. (Doc. 173–19 at 148:14–19; *see also* FDLE Holstine Interview, Doc. 232–2, at 12). At this point, Canela was standing on the left side of the door and in front of Haman. (Doc. 173–9 at 227:17, 229:2–9). Holding his shield in the upright position, (Haman Dep. Pt. 2, Doc. 173–16, at 192:23–25), Canela, again, stepped into the threshold and "cut the pie" to the left to get a visual of the inside of the house. (Doc. 173–9 at 228:10–20, 230:7–8). At the same time, Holstine turned around to face away from the interior door in the garage and out towards the entrance of the garage while moving towards the entrance. (Doc. 173–19 at 149:10–18). While cutting the pie, Canela observed Christopher, to the left of the doorway and only a couple of feet from the doorway, with a knife in his right hand above his head.[7] (Doc. 173–9 at 230:9–15, 230:25–231:2, 233:12–21). Canela observed Christopher aggressively advancing towards him. (*Id.* at 234:11–13). Canela took a step back, (*id.* at 235:1–3), and yelled "knife!", (*id.* at 237:21–22; *see also* Doc.

173–16 at 185:24–25; Doc. 173–19 at 151:9). Haman also observed Christopher advancing toward them with a knife in his right hand raised to about shoulder high and pointing downward. (Doc. 173–16 at 190:12–19, 191:17–25; Doc. 194–1 ¶ 10). Once Christopher reached the threshold of the door, only several feet away from Haman and Canela, Haman shot at Christopher. (Doc. 173–9 at 241:9–10, 241:19–20; Doc. 173–16 at 191:25, 192:19–20, 193:1–2). After Haman began shooting, Canela also fired shots toward Christopher. (Doc. 173–9 at 241:19–242:5). The interior door of the garage was closing as Haman and Canela fired their weapons. (Doc. 173–19 at 154:12–13; *see* Doc. 173–16 at 193:20–21). It was completely shut when the Officers stopped shooting. (Doc. 173–16 at 193:20–23). A total of thirteen shots were fired between the two Officers, eight of which struck Christopher. (Ernest Report, Doc. 183–1, at 8). Twelve of the bullets left bullet holes in the door. (FDLE Investigative Report, Doc. 173–5, at 133).

As for Holstine, upon hearing Canela shout "knife," Holstine turned to re-engage the interior door of the garage. (Doc. 173–19 at 151:9–10). As he was turning, he heard shots fired from Haman and Canela's guns. (*Id.* at 151:9–11). Holstine observed Christopher from the chest up for a split second but did not see his arm raised or a knife in his hand. (*Id.* at 151:12–16).

After ceasing fire, Haman and Canela entered the house, where Christopher Greer was laying down in a supine position. (Doc. 173–16 at 205:16–20). Haman grabbed the knife from the sheath on Christopher's side and put it on a table nearby. (*Id.* at 211:6–7). He also requested

---

7. Plaintiff's argue that whether Plaintiff was holding a knife is a disputed fact. However, as the Court discusses below, it is not.

emergency medical personnel. (Doc. 194–1 ¶ 13). Melbourne Beach Police Department Officer Kino started chest compressions, (Doc. 173–19 at 165:2–7), but his attempts were unsuccessful, and Christopher died at the scene.

In addition to the knife in the sheath on Christopher's side, a knife was found in the folds of a coat near Christopher's left leg, which was broken and covered in blood. (Doc. 183–1 at 8; Doc. 173–5 at 134). Additionally, the interior door displayed what appeared to be a marking from a knife.[8] (Doc. 183–1 at 8; Doc. 173–5 at 133). Plaintiff testified that he had seen the interior side of the door earlier that day and that he had not noticed the marking on the door. (Doc. 173–14 at 280:3–23).

Having complied with Holstine's request, Plaintiff had left the scene and did not see Haman, Canela, and Holstine make their approach towards the home or any of the events that unfolded thereafter. (Doc. 173–13 at 73:3–12, 109:9–12). Plaintiff heard the gunshots as he was walking back to the Greer Residence to check on the Officers progress. (Id. at 74:11–16). Because law enforcement were surrounding the perimeter of the home, Plaintiff could not walk down the street to the home. (Id. at 74:17–23). Nevertheless, he was able to make it to the corner of Shannon Avenue, where Morris informed him that Christopher was dead. (Id. at 74:24–75:5).

Based on these circumstances, Plaintiff and Christine brought numerous claims against thirteen defendants. At this stage of the litigation, Christine is no longer a Plaintiff, (see July 18, 2016 Order, Doc. 160, at 4–5), and the only remaining Defen-

dants are the Town of Indialantic, Corporal James Haman, Deputy Diomedis Canela, and Sheriff Wayne Ivey. As noted, each remaining Defendant has moved for summary judgment. Each Defendant will be addressed in turn.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

However, once the moving party has discharged its burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (quotation omitted). The nonmoving party may not rely solely

---

**8.** Though unable to determine when precisely the marking was made, Defense Expert Dr. Ernest noted that the marking could have

been made by either of the two knives that were found near Christopher immediately after the shooting. (Doc. 183–1 at 8).

on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen*, 495 F.3d at 1314.

### III. SUMMARY JUDGMENT

#### A. The Town

The Court will first address the Town's Motion for Summary Judgment.[9] The only Count remaining against the Town is Count VIII for the negligence of Defendants Holstine and Morris. Specifically, Plaintiff alleges that Morris and Holstine negligently communicated with other law enforcement officers, which directly and proximately caused Christopher Greer's death. For purposes of summary judgment, the parties' arguments center around whether the Town owed Christopher a duty and whether sovereign immunity shields the Town from liability. Plaintiff's Response conflates these issues, which have been a common source of confusion in Florida courts. *See, e.g.*, *Trianon Park Condo. Ass'n, v. City of Hialeah*, 468 So.2d 912, 917 (Fla. 1985) ("It is apparent from the decisions of the district courts of appeal that the courts and the bar are having difficulty interpreting the purpose of [the Florida statute waiving sovereign immunity]."); *see also Wallace v. Dean*, 3 So.3d 1035, 1044 (Fla. 2009) ("[B]rief clarification is necessary concerning the differences between a lack of liability under established tort law and the presence of sovereign immunity."); *Storm v. Town of*

*Ponce Inlet*, 866 So.2d 713, 715 (Fla. 5th DCA 2004) (labeling the doctrine of sovereign immunity under Florida law as "difficult" and "convoluted"). The relevant legal principles are as follows.

■ Section 768.28(5), Florida Statutes, "waived sovereign immunity for the State, its agencies, and its subdivisions in tort actions, rendering the State responsible 'in the same manner and to the same extent as a private individual under like circumstances.'" *Wallace*, 3 So.3d at 1046 (quoting Fla. Stat. § 768.28(5)). "This effectively means that the identical existing duties for private persons apply to governmental entities." *Trianon Park Condo. Ass'n*, 468 So.2d at 917. Accordingly, "there can be no governmental liability unless a common law or statutory duty of care exist[s] that [is] applicable to an individual under similar circumstances." *Henderson v. Bowden*, 737 So.2d 532, 535 (Fla. 1999). Finding that a duty of care exists under the circumstances "is a minimal threshold legal requirement for opening the courthouse doors." *Wallace*, 3 So.3d at 1046 (quotation omitted).

■ "When addressing the issue of governmental liability under Florida law, [courts] have repeatedly recognized that a duty analysis is conceptually distinct from any later inquiry regarding whether the governmental entity remains sovereignly immune from suit notwithstanding the legislative waiver present in section 768.28, Florida Statutes." *Id.* at 1044 (emphasis and footnote omitted); *see also Layton v. Fla. Dep't of Highway Safety & Motor Vehicles*, 676 So.2d 1038, 1040 (Fla. 1st

---

9. In its Response to the Town, as well as Plaintiff's other Responses, Plaintiff indicates that there are numerous factual disputes that preclude summary judgment. However, a re-view of the "disputed material facts," according to Plaintiff, reveals that these facts are immaterial. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

DCA 1996) ("[T]he question of a duty of care is a question separate from the question of whether the governmental activity at issue is protected by operation of sovereign immunity."). "If no duty of care is owed with respect to alleged negligent conduct, then there is no governmental liability, and the question of whether the sovereign should be immune from suit need not be reached. However, if a duty of care is owed, it must then be determined whether sovereign immunity bars an action for an alleged breach of that duty." *Wallace*, 3 So.3d. at 1044 (quotation omitted). Where sovereign immunity applies, it will "shield the government from an action in its courts." *Id.* (footnote omitted). Accordingly, "a court must find no liability as a matter of law if either (a) no duty of care existed, or (b) the doctrine of governmental immunity bars the claim." *Kaisner v. Kolb*, 543 So.2d 732, 734 (Fla. 1989) (emphasis omitted).

### 1. Whether the Town Owed a Duty

With this in mind, the Court will first determine whether the Town owed Christopher a duty of care. The Florida Supreme Court has stated that there are "generally four recognized bases for imposing a duty of care: (1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case." *Wallace*, 3 So.3d at 1047. Furthermore, "[t]o better clarify the concept of governmental tort liability," the Florida Supreme Court has placed governmental functions and activities into four categories: "(I) legislative, permitting, licensing, and executive officer functions; (II) enforcement of laws and the protection of the public safety; (III) capital improvements and property control op-

erations; and (IV) providing professional, educational, and general services for the health and welfare of the citizens." *Trianon Park Condo. Ass'n*, 468 So.2d at 919. These categories serves as a "rough guide as to whether the governmental entity owes the plaintiff a duty of care." *Wallace*, 3 So.3d at 1047 (quotation omitted).

Generally speaking, "there is no governmental tort liability for the action or inaction of governmental officials or employees in carrying out the discretionary governmental functions described in categories I and II because there has never been a common law duty of care with respect to these legislative, executive, and police power functions." *Trianon Park Condo. Ass'n*, 468 So.2d at 921. Rather, for category I and II activities, there is a duty owed to the public at large. *Wallace*, 3 So.3d at 1047. This concept is known as the public-duty doctrine. *See id.* at 1045. "Central to the public-duty doctrine is the principle consistently applied by the courts that government liability may not be established unless there is a common law or statutory duty of care owed by the government to the *individual* rather than to the *general public*." *Manfre v. Shinkle*, 184 So.3d 641, 645 (Fla. 5th DCA 2016) (emphasis added). "On the other hand, there may be substantial governmental liability under categories III and IV. This result follows because there is a common law duty of care regarding how property is maintained and operated and how professional and general services are performed." *Trianon Park Condo. Ass'n*, 468 So.2d at 921.

The parties dispute how Holstine's activity should be categorized. Plaintiff contends that Officer Holstine's was negligent while performing a safety check—a

category IV activity—and that there is sufficient evidence for a jury to conclude that Holstine was engaged in category IV activity. However, categorizing Holstine's conduct is part of the duty analysis which is "a question of law for the court to decide rather than the trier of fact." *Manfre*, 184 So.3d at 645. The Court agrees with the Town that Holstine was engaged in the enforcement of law and protection of the public safety—a category II activity.

Plaintiff alleges that Holstine negligently communicated with other law enforcement officers which resulted in Christopher's death. But Holstine's purported negligence arises out of factual circumstances that demonstrate that Holstine was performing more than a mere safety check. Holstine reported to the Greer Residence in response to a 911 phone call where Plaintiff reported that Christopher had engaged in criminally violent activity by threatening him with a knife and then grabbing and threatening his wife. Plaintiff informed the 911 dispatcher that he "needed an officer immediately." Upon his arrival, Holstine confirmed that Christine had red marks on her neck that were consistent with being choked. Holstine promptly called for assistance from the Brevard County Sheriff's office so that he could establish a perimeter around the home. When Haman arrived, Holstine informed him that the circumstances involved an "assault with a knife" and domestic violence, that Christopher was "a signal 20," meaning that he suffered from mental illness, with a "history of suicide" and "a lot of health issues." Although Plaintiff asked that Christopher be evaluated for a Baker Act, and Holstine indicated that Christo-

pher's mental issues would be handled, this does not change the fact that Holstine was engaged in the enforcement of law and protection of the public safety. Even assuming Holstine was solely focused on Baker Acting Christopher, rather than effectuating an arrest, the Baker Act is a law, one purpose of which is to protect the public safety. *See Williams v. State*, 852 So.2d 433, 434–35 (Fla. 5th DCA 2003) ("[T]he Baker Act provides a procedure for the short-term commitment of persons who are found to be mentally ill, and who, because of the illness, present a threat of substantial harm to their own well-being, or present a danger that the patient will inflict serious bodily harm on himself or herself or on others."), *approved*, 889 So.2d 804 (Fla. 2004). *See generally* Fla. Stat. § 394.451 *et seq.* The factual circumstances here are clearly distinguishable from the facts in *Wallace*, where the court found that the police were engaged in a safety check. 3 So.3d at 1049. Because Holstine was acting to enforce the law and protect the public safety, he did not owe Christopher an individualized duty of care.

■ As for Morris, Plaintiff alleges that he was negligent in failing to communicate with other law enforcement officers or record sufficient information regarding Christopher's mental condition. Neither party addresses which of the *Trianon* categories Morris' conduct falls under. Nevertheless, the Court finds that Morris was also engaged in category II activity. By speaking with Plaintiff about the Baker Act and how Plaintiff could have his brother Baker Acted, Morris was at least indirectly involved with law enforcement.[10] In sum, the duty Morris owed Christopher "was the same

---

10. Based on the general principle that there has never been "any common law duty for either a private person or a governmental

entity to enforce the law for the benefit of an individual or a specific group of individuals," *Trianon*, 468 So.2d at 918, Florida courts

duty of care he owed to everyone. That duty was to do his job, including disseminating information ... competently." *Novoferreiro v. Israel*, No. 14-CIV-62674, 2015 WL 2152682, at *7 (S.D. Fla. May 6, 2015) (citing *Lovett*, 883 So.2d 319, 320 (Fla. 4th DCA 2004)).

No Florida case or statute has been cited which imposes on Morris and Holstine the duty to maintain accurate records or communicate in a "reasonable, safe, prudent, and non-negligent manner," (Doc. 117 at 76), as Plaintiff contends. *See Layton*, 676 So.2d at 1040 (finding that the state did not owe a duty to maintain accurate records and noting that no Florida case or statute had been cited which imposed such a duty). Moreover, were this Court to conclude that Morris and Holstine had a duty to record and communicate certain information, it could open the door to an exorbitant amount of litigation. *See id.* This is a considerable concern given that "[t]he potential multiplicity of suits from the judicial establishment of a municipal duty to private citizens was a factor in *Trianon* weighing against the establishment of such a duty." *Id.*

### 2. *Whether the Town Owed a Special Duty*

■ But even where category II activity is involved, and thus no general duty of

care exists, "the plaintiff must be given an opportunity to plead facts alleging that the governmental actor owed the alleged tort victim a 'special duty of care.'" *Wallace*, 3 So.3d at 1047–48 (emphasis omitted). "A special tort duty ... arise[s] when law enforcement officers become directly involved in circumstances which place people within a 'zone of risk' by": (1) "creating or permitting dangers to exist," (2) "by taking persons into police custody," (3) "detaining them, or" (4) "otherwise subjecting them to danger." *Pollock v. Fla. Dep't of Highway Patrol*, 882 So.2d 928, 935 (Fla. 2004). Despite being given multiple opportunities to amend his Complaint, Plaintiff's Third Amended Complaint does not plead any of the necessary facts to demonstrate that Morris and Holstine placed Christopher in a zone of risk. As a result, Plaintiff's argument that Morris and Holstine owed Christopher a special duty under the zone of risk analysis, which appears for the first time in Plaintiff's Response to the Town's Motion for Summary Judgment, is improperly before this Court. *See In re Andrx Corp.*, 296 F.Supp.2d 1356, 1367 (S.D. Fla. 2003) (refusing to "entertain [the p]laintiffs' new theory raised for the first time in response to [the d]efendants' motion for summary judgment as it [was] not proper-

---

have consistently held that a government actor does not owe a duty to a particular individual to maintain accurate records or to communicate effectively. *See, e.g., Lovett v. Forman*, 883 So.2d 319, 320–21 (Fla. 4th DCA 2004) (finding that the circuit court clerk did not owe a duty to the plaintiff to inform the sheriff that the plaintiff's warrant had been set aside); *Harris v. Kearney*, 786 So.2d 1222, 1226 (Fla. 4th DCA 2001) (concluding that how the Secretary of the Department of Children and Families "supervis[ed] her agents in enforcing the public assistance fraud laws" did not give rise to a duty of care to an individual who was arrested for food stamp fraud after she followed the advice of one of the Department's employees); *Holodak v. Lockwood*, 726 So.2d 815, 815, 817 (Fla. 4th

DCA 1999) (holding that a clerk for the Florida Department of Highway Safety and Motor Vehicles did not owe a special duty to a particular group of plaintiffs to keep accurate records); *Layton v. Fla. Dep't of Highway Safety & Motor Vehicles*, 676 So.2d 1038, 1041 (Fla. 1st DCA 1996) (finding that there is no common law or statutory duty to maintain accurate records of compliance); *Chester v. Metro. Dade Cty.*, 493 So.2d 1119, 1120 (Fla. 3d DCA 1986) (holding that a government agent's failure to fill out an accident report could not give rise to tort liability because the duty to complete an accident report is for the public as a whole, not the accident victims).

ly before the Court" and citing additional cases for support).

■ Even if Plaintiff's argument were properly before the Court, it has no merit. "Where police officers . . . have not arrived on the scene or assumed any degree of control over the situation, the 'zone of risk' analysis has no application." *Pollock*, 882 So.2d at 936. Morris did not arrive at the Greer Residence until after Christopher had been shot. (Doc. 173–22 at 64:5–65:14). Nor do the facts demonstrate that he assumed any control over the situation.

■ As for Holstine, he did not take Christopher into custody or detain him. Thus, under the zone of risk analysis, Holstine only owed Christopher a special duty if he created or permitted dangers to exist or otherwise subjected Christopher to danger. "It is not enough that a risk merely exists or that it is foreseeable. Instead, the defendant's conduct must create the risk or control the situation before liability may be imposed." *Jordan v. Nienhuis*, 203 So.3d 974, 978 (Fla. 5th DCA 2016). In his Response, Plaintiff suggests that Holstine created the dangerous situation by failing to communicate with Haman, Canela, and the other law enforcement officers about Christopher's mental condition. However, Holstine briefed Haman on the relevant facts, including that the incident involved a signal 20, which Haman understood to mean that Christopher might be mentally ill. Holstine further relayed to Haman that Christopher had "a lot of health issues." Shortly after arriving on the scene and obtaining this information from Holstine, Haman took charge, demonstrating that Holstine did not create the risk or control the situation as Plaintiff alleges. Plaintiff also suggests that Holstine created the risk by "fail[ing] to communicate the goal of the mission" with his fellow law enforcement officers. (Doc. 231 at 13). The Court rejects this argument, as the record evidence does not demonstrate that there was a particular agreed-upon goal or pre-established objective that Holstine was working towards when he responded to Plaintiff's 911 call. Plaintiff further argues that Holstine created the risk by bringing an assault rifle to the scene.[11] That Holstine had an assault rifle with him leading up to and during the shooting is irrelevant. Holstine stayed behind Haman and Canela and had no contact with Christopher while armed with the assault rifle. Moreover, Holstine never fired a shot. (Doc. 173–18 at 30:22–31:2) Merely bringing an assault rifle to the scene did not create any risk that would justify imposing a special duty on Holstine.

■ Yet another exception exists and establishes that a law enforcement officer may owe a duty of care to an individual tort victim. This exception requires the law enforcement officer and the tort victim to have a special relationship. "Such a special relationship . . . is created when a law enforcement officer promises or agrees to take some specific action at the individual's request." *Brown v. City of Delray Beach*, 652 So.2d 1150, 1153 (Fla. 4th DCA 1995). The following elements demonstrate the existence of a special relationship: "1) an express promise or assurance of assistance; 2) justifiable reliance on the promise or assurance of assistance; and, 3) harm suffered because of the reliance upon the express promise or assurance of assis-

---

11. Holstine was armed with an AR15 while providing cover while Haman and Canela were attempting to make contact with Chris- topher via the interior garage door. (Doc. 173–19 at 143:12–18).

tance." *Pierre v. Jenne*, 795 So.2d 1062, 1064 (Fla. 4th DCA 2001). Again, this theory is raised by Plaintiff for the first time in his Response, and therefore, it is not properly before the Court. *See In re Andrx Corp.*, 296 F.Supp.2d at 1367. Nevertheless, the Court will explain why this argument also fails.

■ As for Morris, the record evidence is devoid of any facts to demonstrate that he made an express promise or assurance to any of the Greers. In fact, Plaintiff testified that Morris affirmatively told him that the Indialantic Police Department would not Baker Act Christopher and that he needed to go to the court if he wanted Christopher to be mentally evaluated. Morris informed Plaintiff that Christopher could not be Baker Acted by the police unless he was a threat and advised Plaintiff to call the police if Christopher did anything that warranted immediate attention, such as any violent behavior. None of these comments constitute an express promise or assurance that the police would Baker Act Christopher if they received a phone call. Thus, even viewing the evidence in the light most favorable to Plaintiff, the Court concludes that there was no special relationship to give rise to a duty owed by Morris.

■ Plaintiff argues that Holstine made a similar promise to Plaintiff and Christine [12] and assured them that he would assist in getting Christopher the mental and medical help he needed. Notably, Plaintiff presents this argument without any citation to the record. Nevertheless, Holstine's testimony indicates that he advised Plaintiff that his "only mission ... [was] to get him Baker Acted," (Doc. 232–2 at 8), and that he "knew [Christopher] had mental issues and that we would get them dealt with," (Doc. 173–19 at 122:10–11). Holstine's remarks could reasonably be said to constitute an express assurance of assistance to take a specific action. However, even assuming, arguendo, that this was an assurance of assistance that Plaintiff reasonably relied on,[13] the third element—causation—is not met here. The harm at issue here, Christopher's death, was not suffered because of Plaintiff's reliance upon Holstine's assurance of assistance, which resulted in Plaintiff leaving the premises as requested. The harm was suffered because Haman and Canela shot Christopher when they saw him advancing towards them with a knife. Accordingly, the requisite causal nexus is not present. Courts have generally found that a special relationship exists where the government actor unquestionably fails to provide the requested assistance and where there is a clear causal connection between the government actor's failure and the harm caused. *See, e.g., St. George v. City of Deerfield Beach*, 568 So.2d 931, 932 (Fla. 4th DCA 1990) (concluding that there was a special relationship between the dece-

---

12. Plaintiff argues that special duty arose based on the express promises made to both himself and Christine. Because Christine is no longer a party to this lawsuit, the Court will only consider whether a special relationship between Plaintiff and Morris and Plaintiff and Holstine gave rise to a duty.

13. The Court rejects the Town's argument that Plaintiff would have to show that Christopher justifiably relied on Holstine's assurance. Florida law demonstrates that a personal rep-

resentative may established the existence of a duty owed by a government actor pursuant to a special relationship where the personal representative, and not the decedent, relics on the government actor's assurance. *See, e.g., St. George v. City of Deerfield Beach*, 568 So.2d 931, 932 (Fla. 4th DCA 1990); *Hartley v. Floyd*, 512 So.2d 1022, 1024 (Fla. 1st DCA 1987).

dent's ex-wife and the municipality where the 911 operator mishandled a call late in the evening and failed to dispatch police or paramedics to the scene and the decedent was found dead the next morning); *Hartley v. Floyd*, 512 So.2d 1022, 1024 (Fla. 1st DCA 1987) (finding that a special relationship arose where the decedent's wife called the police and was promised three separate times that they would check the boat ramp for her husband's car and call the coast guard to search for her husband, where the police did not check the boat ramp or contact the coast guard as promised yet affirmatively represented to the wife that they had done so, and where the evidence showed that, had the Coast guard been timely notified, the decedent could have been rescued and would have survived). Holstine did not commit a blatant failure like the government actors in the aforementioned cases. Nor is there any evidence to indicate that Holstine did not intend to get Christopher mental help as he had indicated. However, to do this, contact first needed to be made with Christopher, which is what Holstine, Haman, and Canela were attempting to do when this tragic incident occurred.

Furthermore, the Court rejects Plaintiff's suggestion that Morris and Holstine had a duty via the undertaker's doctrine. That doctrine only applies where tradition-

al principles of tort law impose a common law duty of care—i.e., category III and IV activities. *Cf. Wallace*, 3 So.3d at 1049. As discussed above, Morris and Holstine were engaged in category II activities, and no common law duty of care applies. Having determined that the Town did not owe a duty, the Court declines to address the parties arguments as to sovereign immunity and concludes that the Town, as a matter of law, is not liable for the alleged negligence of Morris and Holstine. Thus, summary judgment will be granted on Count VIII.

### B. Haman and Canela [14]

#### 1. *Federal Claim—Excessive Force*

Haman and Canela are named individually and in their official capacities. They seek summary judgment on several of Plaintiff's claims, including Counts III and IV, which Plaintiff brings pursuant to 42 U.S.C. § 1983, alleging that Haman and Canela used excessive force in violation of the Fourth Amendment.[15] Canela and Haman argue that they are entitled to qualified immunity as to these claims. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014) (quoting *Lane v. Franks*, —— U.S. ——, 134 S.Ct. 2369,

---

14. In his Motion for Summary Judgment, Canela refers to a version of the Third Amended Complaint that was stricken and deleted from the record per the Court's Order, (*see* Doc. 115; Jan. 21, 2016 Order, Doc. 116). Because Canela's arguments nevertheless appear to apply to the operative complaint, (*see* Doc. 117), the Court will analyze Canela's arguments accordingly.

15. While the excessive force claims against Haman and Canela are distinct claims against each officer, this Court will address the claims together, as the same facts sur-

round Haman and Canela's use of excessive force. Moreover, Plaintiff presents the same arguments as to why summary judgment should not be entered for Haman and Canela with regard to the excessive force claims. (*See* Doc. 233 at 13 (incorporating by reference the arguments contained in his Response to Haman's Motion for Summary Judgment regarding excessive force and why qualified immunity should not apply to his Response to Canela's Motion for Summary Judgment)).

2381, 189 L.Ed.2d 312 (2014)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). "In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation omitted). If he does, the burden shifts to the plaintiff to satisfy the "two-part inquiry"; on summary judgment, that inquiry requires consideration of—(1) whether, under the plaintiff's version of the facts, the defendant's conduct violated a constitutional right and (2) whether the right was "clearly established." *Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016) (quotation omitted). "A qualified-immunity inquiry can begin with either prong; neither is antecedent to the other." *Morris v. Town of Lexington*, 748 F.3d 1316, 1322 (11th Cir. 2014) (citing *Pearson*, 555 U.S. at 236, 129 S.Ct. 808). It is undisputed that at the time of the complained of conduct, Haman and Canela were acting within the scope of their discretionary authority. (Doc. 183 at 16; *see* Doc. 233 at 13 (incorporating by reference the argument made in Plaintiff's Response to Haman's Motion Summary Judgment into Plaintiff's Response to Canela's Motion for Summary Judgment); *see also* Doc. 234 at 7 (stating that Plaintiff does not dispute that Haman was engaged in discretionary duties)). Therefore, Plaintiff bears the burden of satisfying the two-part inquiry. *See Jackson v. Humphrey*, 776 F.3d 1232, 1240 (11th Cir. 2015) (bypassing the discretionary authority inquiry where not disputed); *Saunders v. Duke*, 766 F.3d 1262, 1266 (2014) (same).

### a. Constitutional Violation

Construing the facts in favor of Plaintiff, neither Haman nor Canela violated Christopher's Fourth Amendment Right to be free from excessive force.[16] "The Fourth Amendment's guarantee against unreasonable searches and seizures includes the right to be free from the use of excessive force in the course of an arrest." *Saunders*, 766 F.3d at 1266–67. "[T]o determine whether the amount of force used was proper, a court must ask whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." *Id.* at 1267 (quotation omitted). Doing so "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). In *Graham*, the Supreme Court offered the following factors for guidance—(1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396, 109 S.Ct. 1865. In the context of deadly force, such force is constitutionally permissible when an officer:

---

**16.** In addition to arguing that they did not use excessive force in violation of the Fourth Amendment, Haman and Canela argue that they did not violate Christopher's Fourth Amendment Rights by entering the Greer Residence, where Christopher had secluded himself, without a warrant. Because Counts III and IV are for excessive force only, Canela and Haman's arguments, as well as Plaintiff's responses regarding the legality of Haman and Canela's warrantless entry are irrelevant and will not be addressed.

(1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible.

*Perez*, 809 F.3d at 1218–19 (quoting *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013). According to the Supreme Court, the latter set of deadly-force factors, which are derived from *Tennessee v. Garner*, 471 U.S. 1, 11–12, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), are "simply an application of the Fourth Amendment's 'reasonableness' test." *Scott v. Harris*, 550 U.S. 372, 382, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Indeed, "*Garner* did not establish a magical on/off switch" for the reasonableness determination. *Id.* "Although these factors are useful, [courts] cannot apply them mechanically"; they must, instead, "slosh [their] way through the factbound morass of reasonableness." *Morton*, 707 F.3d at 1281 (citation and quotation omitted).

■ Here, the inquiry begins with determining the relevant facts for purposes of summary judgment. *See Scott*, 550 U.S. at 378, 127 S.Ct. 1769 ("The first step in assessing the constitutionality of [the defendant's] actions is to determine the relevant facts."). Having already set forth the relevant facts above, the Court need only address one pivotal point: whether Christopher was holding a knife at the time of the shooting. Canela testified that after Haman kicked the interior garage door open, Canela went to the threshold of the door and "cut the pie." (Doc. 173–9 at

228:10–12). As he was cutting the pie, he saw Christopher with a knife in his right hand. (*Id.* at 228:14–15, 230:7–12, 232:3–7, 233:6–14). Canela testified that Christopher was holding the knife above his head and in a downward motion. (*Id.* at 233:15–17). Christopher was within a couple feet of the door, (*id.* at 233:18–21), while Canela and was standing at the threshold, (*id.* at 230:2–6). Canela observed Christopher advancing towards him in an aggressive manner. (*Id.* at 234:2–5, 11–13). Canela stepped back and yelled "knife!"(*Id.* at 235:11–15, 237:21–22, 240:21–25; Doc. 173–16 at 186:10–15). At the same time, Haman also observed Christopher moving towards him and coming into the doorway with a big knife in his right hand and raised about shoulder high, parallel to the ground, and in a downward stabbing motion. (Doc. 173–16 at 190:12–192:21; Doc. 194–1 ¶ 10).

Plaintiff contends, however, that there is a disputed issue of material fact regarding whether Christopher was holding a knife because Holstine was able to see Christopher from the "chest up," and he did not see a knife in Christopher's hand. (Doc. 173–19 at 151:12–13, 166:16–23). But Holstine's testimony also indicates that he was facing away from the doorway when Canela shouted "knife!" (*See id.* at 149:11–18, 151:9–11, 153:4–10). Upon hearing Canela shout, Holstine turned to re-engage the interior door. (*Id.* at 153:4–10). As he was turning to re-engage the door, Holstine heard the gunshots fired by Canela and Haman. (*Id.* at 151:9–11, 153:13–14). Holstine also stated that he only saw Christopher from the chest up for a "split second." (*Id.* at 151:15–16, 154:6–9). Holstine indicated that it took a moment after he turned around for Christopher to come into view because of the clutter in the garage, as well as the fact that he only had an angled view, which Canela was partially

blocking. (Doc. 232–2 at 10, 13; *see also* Doc. 232–1 at 14 (stating that his view was "obscured")). Haman was also blocking part of Holstine's view, preventing him from being able to see Christopher's hands. (Doc. 232–2 at 13). Additionally, the inside of the home was not very bright. (Doc. 173–9 at 200:4–8; Doc. 173–16 at 187:21–22). And while Canela and Haman were only two or three feet away from the door when they observed Christopher advancing with a knife, (Doc. 173–9 at 233:20–21, 241:8–10; Doc. 173–16 at 192:19–20; Doc. 173–19 at 151:25–152:3), Holstine was standing ten to twelve feet away, (Doc. 173–19 at 151:4–7). Accordingly, Hosltine's testimony, when compared to that of Haman and Canela, does not create a genuine issue of material fact. *See Garczynski v. Bradshaw*, 573 F.3d 1158, 1168, 1171 (11th Cir. 2009) (affirming summary judgment on the basis of qualified immunity for an excessive force claim and finding that there was no genuine issue of material fact as to whether the decedent brandished a gun where one officer, who was further away and had an obscured view, testified that he never saw the decedent with a firearm, while several other officers, who were closer and in plain view saw the decedent holding a gun); *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1249–50 (11th Cir. 2004) (finding that

there was not substantial contradicting evidence, and thus summary judgment was appropriate for an excessive force claim arising from a police shooting despite the fact that one eyewitness's testimony conflicted with the unanimous testimony of the other eyewitnesses because, in part, the single eyewitness could only provide a "snapshot" version of what happened, his testimony was based on what he viewed while driving by the scene—"forced to look through the tinted glass of the passenger side window, across the front seat of the car, and through the glass on the driver's side"—and the eyewitness could only see the victim from the shoulders up).

Moreover, when asked if there were any weapons in the house, Plaintiff informed Holstine that there were knives. The physical evidence also supports that Christopher was holding a knife in his hand just before he was shot. *See Herrington*, 381 F.3d at 1249 (determining that a witness's testimony was "not substantial evidence and must be disregarded" where his testimony was inexplicably inconsistent with the photographic evidence). Two knives were found near Christopher after he was shot—one in the sheath on his side [17] and the other located near Christopher's left leg, which was broken, covered in blood, and in the folds of a coat.[18] After the

**17.** Canela testified that the knife that he observed Christopher holding appeared to be different than the knife in the sheath found on Christopher's side. (Doc. 173–9 at 232:8–10).

**18.** Plaintiff further disputes whether Christopher was holding a knife when he was shot because the only knives found at the scene were these two knives. Nevertheless, this evidence does not create a material dispute as to whether Haman and Canela observed Christopher holding a knife. *See Garczynski*, 573 F.3d at 1169 (finding that there was no disputed issue of material fact as to whether the suspect was holding a gun when officers shot

him because, despite the plaintiff's argument otherwise, "the gun's final resting place [wa]s not probative of whether or not [the suspect] aimed his gun at the officers"). It therefore follows that precisely where these two knives were found does not create a genuine dispute of material fact as to whether Canela and Haman reasonably perceived that Christopher posed a threat of imminent harm. *See id.* at 1168 (explaining that despite conflicting testimony and the location of where the gun was found, the officers "reasonably reacted to what they perceived as an immediate threat of serious harm to themselves").

shooting, what appear to be markings from a knife were discovered on the side of the door that Christopher was standing on, which could have been made with either of the knives found near Christopher after he was shot. Furthermore, Plaintiff indicated that although he had seen the side of the door with the marking earlier that day before the shooting, he had not seen the marking on the door.

Thus, Holstine's testimony is insufficient to defeat Canela and Haman's testimony for purposes of summary judgment. *See id.* at 1249–50 ("A mere scintilla of evidence in support of the non-movant is insufficient to defeat a motion for summary judgment." (citing *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505)); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) ("A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." (quotation omitted)).

As a result, there is no genuine dispute as to whether, just prior to the shooting, Canela and Haman saw Christopher holding up a knife while standing a short distance away from the Officers, aggressively advancing toward them. Additionally, both Haman and Canela testified that they felt their lives were in danger. (Doc. 173–9 at 238:11–17; Doc. 173–16 at 193:4–7). These facts justify the Officers' use of deadly force.[19] *See Martinez v. City of Pembroke Pines*, 648 Fed.Appx. 888, 893 (11th Cir. 2016) ("It is reasonable, and therefore constitutionally permissible, for an officer to use deadly force against a person who poses an imminent threat of serious physical harm to the officer or others."); *McCormick*, 333 F.3d at 1246 ("Because the Constitution permits the use of deadly force to prevent a violent suspect from escaping, the Constitution must also permit the use of deadly force against a suspect who poses not merely an escape risk (because he is not yet in police control), but also an imminent threat of danger to a police officer or others."); *see also Garczynski*, 573 F.3d at 1169 (11th Cir. 2009) ("Accordingly, we concluded that the officer was justified in shooting ... because the officer could reasonably believe that the man posed a risk of serious physical injury to the officer ...." (citing *Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997)); *Furtado v. Yun Chung Law*, 51 So.3d 1269, 1275 (Fla. 4th DCA 2011) (affirming summary judgment for deputy and sheriff on the plaintiff's excessive force claim where "the decedent lunged at the deputies with a knife raised over her head"); *City of Miami v. Sanders*, 672 So.2d 46, 47 (Fla. 3d DCA 1996) ("Law enforcement officers are provided a complete defense to an excessive use of force claim where an officer reasonably believes the force to be necessary to defend himself or another from bodily harm ...." (quotation omitted)).

---

**19.** The Eleventh Circuit has affirmed summary judgment on the basis of qualified immunity where officers used deadly force in response to a weapon generally considered less lethal than a knife, *see McCormick*, 333 F.3d at 1246 (holding that officer acted reasonably when he shot a man who had recently committed violent acts against another person and who approached the officer while raising his walking stick above his head and pumping or swinging his stick at the officer), or no weapon at all, *see Martinez v. City of Pembroke Pines*, 648 Fed.Appx. 888, 890, 893 (11th Cir. 2016) (concluding that officer acted reasonably when he shot an individual who appeared to be suffering from some type of psychological fit, had already injured the officer, and took two steps toward the officer without any weapon other than one end of a pair of handcuffs attached to one of his wrists).

Although Canela was holding a shield when Christopher advanced toward Haman and Canela with the knife, Canela nevertheless testified that he felt threatened because Christopher was taller than him, had the knife raised up, and the shield did not provide coverage for his head.[20] (Doc. 173–9 at 239:15–23). Even with a shield, given the facts of this case, an objectively reasonable officer would have perceived Christopher as a threat. Plaintiff's rely on *Lam v. City of San Jose*, No. 5-14-cv-008877-PSG, 2015 WL 5591037 (N.D. Cal. Sept. 23, 2015), to argue that there is a factual dispute regarding whether the officers were threatened which bars the court from deciding Plaintiff's excessive force claims on summary judgment. *Lam*, however, is distinguishable. In that case, there was conflicting testimony from four eyewitnesses regarding several crucial events leading up to the shooting, and notably, there was no indication that any of the four eyewitnesses had any difficulty or limitations observing what had happened. As previously discussed, there is no substantial conflict in the testimony here so as to preclude summary judgment. Additionally, the Eleventh Circuit has held that the "use of deadly force [is] constitutional under the circumstances" where "the officer reasonably could have perceived that the suspect posed an imminent and serious threat." *Martinez*, 648 Fed. Appx. at 894 (citing *McCormick*, 333 F.3d at 1246). Not only did Haman and Canela indicate that they felt seriously threatened by Christopher, but the Court finds that Haman and Canela's fear was reasonable.

Analyzing the circumstances under the *Graham* factors supports the conclusion

that both Haman and Canela acted reasonably under the circumstances. As for the first factor—the severity of the crime at issue—the undisputed facts show that Christopher threatened his brother with a knife and choked his brother's wife, causing Plaintiff to call the police and request immediate assistance. Holstine first arrived on the scene and then relayed the pertinent information to Haman upon his arrival, specifically stating that Christopher had committed an aggravated assault with a knife and domestic violence when Christopher choked his brother's wife. Aggravated assault is not only a violent crime, but a felony under Florida law, *see* Fla. Stat. § 784.021, and Florida's domestic violence statutes authorize the arrest of any individual who has committed domestic violence so long as there is probable cause, *see* Fla. Stat. § 741.29(3). Thus, the facts demonstrate that Christopher had committed violent criminal activity and threatened to inflict serious physical harm on others.

As previously discussed, the record evidence indicates that the second *Graham* factor—whether the suspect poses an immediate threat to the safety of the Officers or others—must be answered in the affirmative. Given that Christopher advanced towards the Officers with a knife raised in the air, until there was only a couple of feet between them, the Officers reasonably believed that Christopher posed an immediate threat to their safety.[21]

Looking to the third *Graham* factor, Christopher was not evading arrest by

**20.** Canela was holding a ballistic shield, specifically known by Canela as a "bat shield," which was designed to protect from the neck down, but left Canela and Haman's heads exposed. (Doc. 173–8 at 104:16–24). Canela

estimated that it was approximately three-feet tall. (*Id.* at 106:9–10).

**21.** Haman and Canela's testimony also reveals that they had an erroneous belief that someone was in the house with Christopher

flight. However, he certainly was not compliant with Haman and Canela's requests to come outside of the home. First, Holstine tried to make contact with Christopher at the front door, but Christopher shut the door and told him to not "even think about it." Next, Haman tried to use a public address system in Holstine's officer vehicle to contact Christopher. Haman announced that he was with the Sheriff's Office and ordered Christopher to exit the house, but Christopher did not respond. After that, Haman and Canela attempted to contact Christopher at the front door. Haman and Canela knocked, checked the door handle, and asked Christopher to come outside and speak with them. Again, Christopher did not respond. Haman and Canela then went to the door leading into the house from the garage, announced their presence, and tried to open the door. Yet again, there was no response. When Haman and Canela were able to open the door leading into the house, the door was quickly shut and forced to remain closed—with what Canela and Haman believed was Christopher's own body weight—preventing the Officers from gaining entry until there was no longer an opposing force on the other side. This certainly qualifies as resistance.

Thus after applying the *Graham* factors and analyzing this case based on the totality of the circumstances, the Court finds that the Officers acted objectively reasonable under the circumstances. *See McCormick*, 333 F.3d at 1246 (determining that the officer's decision to shoot a suspect was objectively reasonably where, among other things, the suspect "posed an imminent threat of violence to the officer" and "continued to ignore repeated commands").[22]

■ Plaintiff relies on the fact that the Officers did not warn Christopher about their potential use of deadly force. However, a warning is only required, *"if feasible."* *Perez*, 809 F.3d at 1218–19. A warning was not feasible here. As soon as Christopher came into sight upon the door being opened a second time, Haman and Canela observed Christopher aggressively advancing toward them until he was just a couple feet away. Additionally, Haman and Canela testified that everything happened very quickly from the time the door opened the second time to the time shots were fired. (Doc. 173–9 at 233:20, 242:11, 249:14, 260:1–3; Doc. 173–16 at 196:20–22 (stating that it was about "three seconds or four seconds and it was over"), 199:22–24).

---

and therefore determined that they needed to take action to ensure the safety of that individual. Plaintiff suggests that it was unreasonable for Haman or Canela to believe that someone else was in the house with Christopher because Holstine specifically informed Haman that Christopher was alone. Although this mistaken belief that someone else was in the house with Christopher, is perhaps relevant to determining whether Christopher posed an immediate threat to the safety of another, the Court has already determined that Christopher posed an immediate threat to the safety of the Officers, justifying their use of excessive force. Accordingly, the Court need not delve into this disputed matter—i.e., the reasonableness of Haman and Canela's use of force given their erroneous belief that

there was possibly an elderly man upstairs, trapped in a hostage situation.

22. Plaintiff relies on the expert testimony of Dr. Kirkham, who opines that the Officers acted unreasonably because they violated nearly every one of the crisis intervention procedures, citing to the International Association Chiefs of Police. Nevertheless, the "sole inquiry is whether the officer[s'] action[s], as taken, were objectively reasonable under the circumstances. In this case, they were." *Garczynski*, 573 F.3d 1158, 1167–68 (11th Cir. 2009); *see also id.* ("Our task is not to evaluate what the officers could or should have done in hindsight.").

There simply was not enough time to give a warning.

Notably, failing to give a warning does not automatically render Haman and Canela's use of force excessive. Rather, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865. In fact, courts have discouraged law enforcement officers from delaying the use of force—even deadly force—where the circumstances demonstrate that such force is objectively reasonable. *See Scott*, 550 U.S. at 385, 127 S.Ct. 1769 ("We think the police need not have taken that chance and hoped for the best."); *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."); *see also Martinez*, ·648 Fed.Appx. at 894 (stating that the law enforcement officer was not "required to wait and see what might happen if he allowed Plaintiff to advance further").

Plaintiff also argues that a reasonable jury could find that Canela and Haman used excessive force because the Officers did not make any attempt to use other methods to subdue Christopher.[23] For the same reasons discussed above, employing less than lethal force was not a viable option here. More importantly, Haman and Canela were not required, as a matter of law, to use a lesser alternative where deadly force was warranted. *See Menuel v. City of Atlanta*, 25 F.3d 990, 996 (11th Cir. 1994) ("There is no precedent in this Circuit (or any other) which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used. There are, however, cases which support the assertion that, where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-deadly alternatives first . . . ." (quotation omitted)).

▆ Plaintiff emphasizes that the Officers fired a total of thirteen shots, twelve of which went through the closed door. However, this does not demonstrate that the Officers acted unreasonably. First, the Court notes that the Officers did not open fire through a closed door, as Plaintiff contends. The record evidence indicates that each of the Officers started shooting after seeing Christopher with a knife raised, that they began shooting while the door was open, and that the door closed as they were shooting. Moreover, the Supreme Court has stated that "if police officers are justified in firing at a suspect in order to end a severe threat . . . , the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, — U.S. ——, 134 S.Ct. 2012, 2022, 188 L.Ed.2d 1056 (2014).[24]

Finally, Plaintiff, citing *Swofford v. Eslinger*, 671 F.Supp.2d 1289 (M.D. Fla.

**23.** Plaintiff also argues that a reasonable jury might find that Haman and Canela used excessive force because they failed to de-escalate the use of force needed once Christopher complied with their demands. The Court does not understand this argument as there is no record evidence that Christopher ever complied with the Officers' requests.

**24.** In reaching this conclusion, the Court recognized that "officers are taught to keep shooting until the threat is over." *Plumhoff*, 134 S.Ct. at 2022 (quotation omitted). Both Haman and Canela testified that this is in fact what they had been trained to do. (Doc. 173–9 at 244:6–20; Doc. 173–16 at 247:1–8).

2009), argues that qualified immunity does not apply where the defendants own objectively unreasonable actions create the risk that results in the use of deadly force. Plaintiff's reliance on *Swofford* misses the mark. The court in *Swofford* emphasized that the officers were not entitled to qualified immunity for the plaintiff's excessive force claim because the officers had created the danger resulting in the use of deadly force by unreasonably entering onto the plaintiff's property. *Id.* at 1305–1307. Thus, the court's excessive force analysis was informed by the court's unlawful entry analysis. *See id.* at 1302–07. As previously noted, there is no claim for unlawful entry at issue in this case. Also, the facts of *Swofford* are clearly distinguishable from the facts of this case. Lastly, despite Plaintiff's argument to the contrary, it was not the Officers' attempts to enter the home that created the risk that led to the use of deadly force. It was the fact that Christopher threatened Canela and Haman with a knife that led to the use of deadly force.

As the foregoing analysis has demonstrated and after considering Plaintiff's version of the facts, the Court concludes that the Officers acted objectively reasonably under the circumstances, and, therefore did not violate Christopher's Fourth Amendment right to be free from excessive force.

### b. Clearly Established Law

Even assuming a constitutional violation, Haman and Canela "are entitled to qualified immunity unless Plaintiff can show that his Fourth Amendment rights were 'clearly established' at the time of the shooting. *Kenning v. Carli*, 648 Fed.Appx. 763, 770 (11th Cir. 2016) (citing *Plumhoff*, 134 S.Ct. at 2023). Under the second prong of the qualified immunity analysis, "[t]he relevant, dispositive inquiry in determining

whether a right is *clearly* established is whether it would be *clear* to a reasonable [police officer] that his conduct was unlawful in the situation he confronted." *Morris*, 748 F.3d at 1322 (quoting *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012)). It follows that the right "alleged to have [been] violated must have been 'clearly established' in a more particularized, and hence more relevant, sense." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Eleventh Circuit has articulated three ways to demonstrate that a right violated was clearly established—(1) "produc[ing] a materially similar case decided by the Supreme Court, [the Eleventh Circuit], or the highest court of the relevant state"; (2) "point[ing] to a broader, clearly established principle that should control the novel facts in his situation"; or (3) "show[ing] that an [officer's] conduct was so far beyond the hazy border between excessive and acceptable force that the [officer] had to know he was violating the Constitution even without caselaw on point." *Morton*, 707 F.3d at 1282 (quotations omitted); *cf. Perez*, 809 F.3d at 1222 (requiring that the caselaw, under option one, be "indistinguishable" to the present facts). "The 'salient question' is whether the state of the law at the time of the incident gave [the defendant] 'fair warning' that his conduct was unlawful." *Perez*, 809 F.3d at 1222 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). Plaintiff has not established that Haman and Canela violated Christopher's clearly established Fourth Amendment rights. As previously discussed, courts have consistently upheld an officer's use of deadly force based on the general principle that deadly force is justified where the law enforcement officer reasonably believes that the aggressor poses an

imminent threat to the law enforcement officer's safety. *See, e.g.*, *McCormick*, 333 F.3d at 1246; *see also Garczynski*, 573 F.3d at 1169; *Sanders*, 672 So.2d at 47. Thus, it would not have been clear to a reasonable law enforcement officer in Haman or Canela's shoes that his conduct was unlawful.

In sum, even after viewing the facts in Plaintiff's favor, the Court concludes that Haman and Canela's conduct was reasonable within the meaning of the Fourth Amendment. Furthermore, it would not have been clear to a reasonable officer faced with the same circumstances as Canela and Haman that the use of deadly force was unlawful. Therefore, Haman and Canela are entitled to qualified immunity as to Counts III and IV, respectively. Haman's Motion for Summary Judgment will be granted as to Count III, and Canela's Motion for Summary Judgment will be granted as to Count IV.

### 2. State Law Claims

The remaining claims against Haman [25] and Canela are for intentional infliction of emotional distress ("IIED"), assault, and battery. There is also a claim against Canela for negligent infliction of emotional distress. The Court finds that summary judgment is proper on Plaintiff's state law claims for the reasons stated below.

#### a. Intentional Infliction of Emotional Distress

▇▇▇ Count XX alleges IIED against Haman and Canela in violation of Florida common law. "To prove [IIED] under Florida law, the plaintiff must prove: (1) deliberate or reckless infliction of mental suffering; (2) by outrageous conduct; (3) which conduct must have caused the suffering; and (4) the suffering must have been severe." *Hart v. United States*, 894 F.2d 1539, 1548 (11th Cir. 1990) (citing *Metro. Life Ins. Co. v. McCarson*, 467 So.2d 277, 278 (Fla. 1985)). "Florida courts use a very high standard in evaluating whether the facts alleged are sufficiently outrageous." *Frias v. Demings*, 823 F.Supp.2d 1279, 1288 (M.D. Fla. 2011) (quoting *Metro. Life Ins. Co.*, 467 So.2d at 278–79). Conduct satisfies the "outrageous" requirement only if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Metro. Life Ins. Co. v. McCarson*, 467 So.2d 277, 279 (Fla. 1985) (quotation omitted). "Whether the conduct is outrageous enough to rise to the level required by the tort may be decided as a question of law when the facts of a case can under no conceivable interpretation support the tort." *Vance v. S. Bell. Tel. & Tel. Co.*, 983 F.2d 1573, 1581 (11th Cir. 1993) (quoting *Williams v. City of Minneola*, 575 So.2d 683, 692 (Fla. 5th DCA 1991)).

▇▇▇ As discussed repeatedly, Defendants Haman and Canela acted objectively reasonable under the circumstances when they attempted to make contact with Christopher and shot him after he threat-

---

**25.** In Haman's Motion for Summary Judgment, he argues that the Court should grant summary judgment on all of Plaintiff's state law claims against him—assault, battery, and intentional infliction of emotional distress—because he is entitled to sovereign immunity under section 768.28(9)(a), Florida statutes. Because there is no record evidence indicating that that Haman acted in "bad faith or with malicious purpose or in a manner exhib-

iting wanton and willful disregard of human rights, safety, or property," as is required to hold a government actor personally liable under the statute, and because Plaintiff has failed to respond to this argument, the Court agrees that Haman is entitled to sovereign immunity on Plaintiff's state law claims. Nevertheless, the Court will address Haman's other arguments and Plaintiff's responses.

ened them with a knife. Having already concluded that Haman and Canela acted reasonably under the circumstances, it follows that their actions do not amount to conduct "so outrageous in character" as to support a claim for IIED. *See Davis v. City of Leesburg*, No. 5:12-cv-609-Oc-10PRL, 2014 WL 4926143, at \*27 (M.D. Fla. Sept. 30, 2014) ("Summary judgment shall be granted as to [the plaintiff's IIED] claims because under Florida law, these law enforcement officers are entitled to use reasonable force to carry out a lawful arrest without opening themselves to individual tort liability.").

 Additionally, Plaintiff has failed to produce evidence showing that Haman and Canela's conduct caused severe emotional distress. While Plaintiff argues that as a result of the incident, he "suffers from post-traumatic stress disorder, depression, anxiety, sleep loss, fatigue, and a number of other physical manifestations of severe emotional stress," (Doc. 233 at 15), he presents no evidence of the foregoing. At this stage of the litigation, Plaintiff's unsupported assertions are insufficient to demonstrate that he suffers from severe emotional distress. *See Triana v. Diaz*, No. 12-21309-CIV, 2014 WL 5319800, at \*7 (S.D. Fla. Oct. 16, 2014) (granting summary judgment for the officer on the plaintiff's IIED claim because the plaintiff had "failed to come forward with competent evidence upon which a jury might rely to find that Plaintiff suffered severe emotional distress as a result of th[e] incident"); *see also Rubio v. Lopez*, 445 Fed.Appx. 170, 175 (11th Cir. 2011) (affirming the district court's grant of summary judgment on the plaintiff's IIED claim where the plaintiff's psychiatric expert's testimo-

ny did not indicate that the plaintiff suffered severe emotional distress as a result of the officer's conduct).

Because Plaintiff has failed to demonstrate that Haman and Canela's conduct was outrageous and because he has failed to show that the Officers' conduct has caused him severe emotional distress, Haman and Canela's motions for summary judgment will be granted as to Plaintiff's IIED claim. *See Rubio*, 445 Fed.Appx. at 175.

### b. *Assault and Battery*

Counts XXII and XXIII allege "aggravated" assault and aggravated battery under state law against Defendants Haman and Canela.[26] Haman correctly asserts that there is no civil cause of action for "aggravated" assault or battery, and Plaintiff fails to respond to this argument. Nevertheless, the Court will construe these claims as claims for assault and battery under Florida common law. Haman argues that Plaintiff's assault and battery claims are duplicative and therefore improper under Florida's Wrongful Death Act. *See Lyles v. Osceola Cty.*, No. 6:11–cv–1585–Orl–36DAB, 2012 WL 4052258, at \*5 (M.D. Fla. Sept. 13, 2012) ("The Wrongful Death Act permits the personal representative of the decedent to bring one action for the benefit of the estate and the survivors."). Plaintiff maintains that the claims for assault and battery properly seek relief pursuant to Florida's Wrongful Death Act. The Court cannot completely decipher Haman's argument about duplicity. However, to the extent Haman is arguing that Counts XXII and XXIII are duplicative as to Count IX, which alleges wrongful death caused by Haman's intentional torts, the Court agrees.

---

26. Curiously, Canela did not move for summary judgment as to Counts X, XXII, or XXI-II. Thus, summary judgment on these Counts will only be considered as to Haman.

The Florida Wrongful Death Act permits a cause of action "[w]hen the death of a person is caused by the wrongful act, negligence, default, or breach of contract or warranty of any person ..., and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued." Fla. Stat. § 768.19. According to the Act, a wrongful death action "shall be brought by the decedent's personal representative, who shall recover for the benefit of the decedent's survivors and estate all damages, as specified in [the] act, caused by the injury resulting in death." *Id.* § 768.20. Thus, the enactment of the Wrongful Death Act created a new right of recovery, as under "the common law[,] no one had any right to recover for the negligent or wrongful death of another." *Louisville & N.R. Co. v. Jones*, 45 Fla. 407, 416, 34 So. 246 (1903). In other words, the Wrongful Death Act is the statutory mechanism which permits Plaintiff to bring the assault and battery claims on behalf of Christopher's survivors and his estate. Because Plaintiff alleges that Christopher's death resulted from the alleged assault and battery, the assault and battery claims will be treated as part of Plaintiff's wrongful death claim as alleged in Count IX of the Complaint.[27] *See Christie v. Lee Cty. Sheriff's Office*, No. 2:10-CV-420-FTM-36, 2011 WL 4501973, at *6 (M.D. Fla. Sept. 28, 2011) (noting that because the plaintiff's state law claim for assault and battery alleged that the decedent's injuries resulted in death, the count would be treated as a wrongful death action).

Under Florida law, assault and battery are two distinct torts. "An 'assault'

is an intentional, unlawful offer of corporal injury to another by force, or exertion of force directed toward another under such circumstances as to create a reasonable fear of imminent peril." *Sullivan v. Atl. Fed. Sav. & Loan Ass'n*, 454 So.2d 52, 54 (Fla. 4th DCA 1984). "[A] battery consists of the intentional infliction of a harmful or offensive contact upon the person of another." *Id.* "[A] presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damages only where the force used is clearly excessive." *Sanders*, 672 So.2d at 47. "[I]f such excessive force is used in an arrest, it is transformed into a battery." *Hung Phan v. City of St. Petersburg, Fla.*, 2007 WL 1225380, at *5. "A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." *Berry v. McGowan*, No. 6:15-cv-145-ORL-41GJK, 2016 WL 4212068, at *6 (M.D. Fla. Aug. 10, 2016) (quotation omitted). "This is a 'similar standard' to that employed under the Fourth Amendment." *Id.* (quoting *Sullivan v. City of Pembroke Pines*, 161 Fed. Appx. 906, 911 (11th Cir. 2006)).

As previously discussed, Haman employed an amount of force that was not clearly excessive, but rather, reasonable under the circumstances. Thus, Haman is entitled to summary judgment as to Plaintiff's claim for battery. And to the extent Plaintiff alleges that Haman "assaulted him during the same encounter, that claim is likewise foreclosed since any threat of force was reasonable." *Cutino v. Untch*, 79 F.Supp.3d 1305, 1315 (S.D. Fla. 2015). Consequently, Haman's Motion will be

---

**27.** Furthermore, that Counts XXII and XXIII are duplicative of Count IX is indicated by the fact that Plaintiff's concede in Counts XXII and XXIII that they are seeking relief under Florida's Wrongful Death Act. (Doc. 234 at 16–17).

granted with regard to the assault and battery claims. And because these claims formed the basis for Plaintiff's wrongful death action, asserted in Count IX, summary judgment is also appropriate as to Count IX.

### c. Negligent Infliction of Emotional Distress

Count XIV alleges negligent infliction of emotional distress against Canela. Plaintiff argues in his response that the Court dismissed Count XIV with prejudice, and therefore, the Court should deny Canela's motion as to Count XIV as moot. Plaintiff is incorrect. The Court dismissed Count XIV with prejudice insofar as it names Deputy Haman only. (Doc. 160 at 24). Therefore, the Court will consider Canela's arguments as to Count XIV.

 Canela argues that he is entitled to summary judgment as to Plaintiff's negligent infliction of emotional distress claim based on section 768.28(9)(a) of the Florida Statutes, which shields officers of the state from liability for "any act, event, or omission of action in the scope of her or his employment or function, unless such officer . . . acted in bad faith or with malicious

purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Because Plaintiff has failed to present any evidence demonstrating that Canela acted with the requisite intent under section 768.28(9)(a), the Court will grant Canela's motion for summary judgment as to Plaintiff's claim for negligent infliction of emotional distress.

### C. Sheriff Ivey

 Count VII is asserted against Defendant Wayne Ivey in his official capacity as Sheriff of Brevard County for the negligence of Defendants Haman and Canela. Plaintiff challenges Haman and Canela's negligent operation of their firearms, which Plaintiff contends resulted in Christopher's death.[28] Plaintiff's negligence claim fails as a matter of law for two reasons. First, the facts here indicate that Haman and Canela intentionally fired their weapons in self-defense. *See Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1264 (11th Cir. 2001) (allowing a negligent use of a firearm claim to survive the motion to dismiss stage, but noting that "discovery may reveal that the shooting was an intentional act and negligence played no part").

---

**28.** Though not entirely clear, it appears that Plaintiff's Response attempts to enlarge his claim beyond the Officers' decision to use firearms. Plaintiff seems to attack the manner in which Haman and Canela tactically handled the situation, including how the Officers approached the home and attempted to make contact with Christopher. (*See* Doc. 235 at 6 ("The police breached that duty by negligently apprehending Christopher."); *id.* at 6–7 (presenting expert opinion testimony regarding crisis intervention procedures and the proper way to approach mentally disturbed persons); *id.* at 10 (stating that the jury could conclude that the Officers negligently apprehended Christopher); *id.* at 12 (arguing that the jury could conclude that the Officers' negligence in apprehending Christopher caused his death)). However, Plaintiff originally stated a

claim solely for the Officers' "negligent operation of their firearms," (Doc. 117 at 74). Allowing Plaintiff to amend his claim to encompass additional conduct, such as the Officers' attempts to make contact with Christopher, which led to the shooting, at this stage of the litigation would be improper. *See In re Andrx Corp.*, 296 F.Supp.2d at 1367. Moreover, in Plaintiff's Response to Haman's Motion for Summary Judgment, he characterized the claim pending against Ivey as follows: "At issue is the very *decision to use firearms* while apprehending a known mentally-challenged person . . . ." (Doc. 235 at 6 (emphasis added)). Accordingly, the Court will only address the narrow issue of whether the Officers were negligent in using their firearms.

Second, "a claim for the negligent handling of a firearm turn[s] on whether the amount of force used was reasonable under the circumstances." *Young v. Borders*, No. 5:13-CV-113-OC-22PRL, 2014 WL 11444072, at *20 (M.D. Fla. Sept. 18, 2014), *aff'd*, 620 Fed.Appx. 889 (11th Cir. 2015). As previously discussed at length, the record evidence demonstrates that Haman and Canela acted reasonably when they decided to use their firearms. Therefore, Ivey's Motion for Summary Judgment will be granted.

## IV. CONCLUSION

It is therefore **ORDERED** and **ADJUDGED** as follows:

1. Defendant Town of Indialantic's Motion for Summary Judgment (Doc. 174) is **GRANTED.**

2. Defendant Canela's Motion for Summary Judgment (Doc. 183) is **GRANTED.**

3. Defendant Haman's Motion for Summary Judgment (Doc. 194) is **GRANTED.**

4. Defendant Ivey's Motion for Summary Judgment (Doc. 185) is **GRANTED.**

5. Defendant Town of Indialantic's Motion to Exclude Opinions of Dr. George Kirkham (Doc. 189) is **DENIED as moot.**

6. Plaintiff's Daubert Motion to Exclude Testimony and Opinions of Defense Expert Charlie Mesloh (Doc. 199) is **DENIED as moot.**

7. Defendant Town of Indialantic's Motion in Limine (Doc. 244) is **DENIED as moot.**

8. Plaintiff's Motion to Strike Supplemental Report and Limit Expert's Opinions of Dr. Krzysztof Podjaski (Doc. 200) is **DENIED as moot** as to Defendant Town of Indialantic, Defendant Haman, and Defendant Ivey and is **DENIED without prejudice** as to Defendant Canela.

9. Plaintiff's Daubert Motion to Strike Second Supplemental Report and Expert Opinions of Dr. Richard M. Hough, Sr. (Doc. 201) is **DENIED as moot** as to Defendant Town of Indialantic, Defendant Haman, and Defendant Ivey and is **DENIED without prejudice** as to Defendant Canela.

10. Plaintiff's Daubert Motion to Exclude Medical Examiner Opinion Evidence (Doc. 207) is **DENIED as moot** as to Defendant Town of Indialantic, Defendant Haman, and Defendant Ivey and is **DENIED without prejudice** as to Defendant Canela.

11. Defendants' Motion in Limine (Doc. 243) is **DENIED as moot** as to Defendant Ivey and Defendant Haman.

12. Because Canela has failed to move for summary judgment on Counts X, XXII, and XXIII, the Court will hold a telephonic status conference with Counsel for Plaintiff and Defendant Canela on **Tuesday, March 28, 2017, at 9:30 AM,** to determine how the parties plan to proceed. Counsel for Defendant Town of Indialantic, Defendant Haman, and Defendant Ivey shall also participate in the telephonic status conference. Counsel shall call the Courtroom Deputy Clerk at 407–835–4304 by **5:00 PM on Monday, March 27, 2017,** to advise of a tele-

phone number where they can be reached for the conference.

13. Once all claims have been resolved in this matter, judgment will be entered accordingly.

**DONE** and **ORDERED** in Orlando, Florida on March 14, 2017.